CLERK'S OFFICE U.S. DIST COURT
AT ROANOKE, VA
FILED

DEC 1 2 2008

JOHN F. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| JERRY L. OLIVER, | ) | |
| Plaintiff, | ) | Civil Action No. 7:08-cv-00558 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| CPTN. MYERS, et. al., | ) | By: Hon. James C. Turk |
| Defendants. | ) | Senior United States District Judge |

Plaintiff Jerry L. Oliver, a Virginia inmate proceeding pro se, brings this action under the

Civil Rights Act, 42 U.S.C. §1983, with jurisdiction vested under 28 U.S.C. §1343.  In his

complaint, Oliver alleges that the defendants, officials at Green Rock Correctional Center ("Green

Rock"), violated his constitutional rights when they allowed an unapproved visitor (a "stalker"),

carrying a concealed knife, to enter the visiting area where Oliver was talking to his approved visitor.

Oliver seeks monetary and injunctive relief.  Upon consideration of the complaint, the court finds

that this action should be dismissed pursuant to 28 U.S.C. §1915A(b)(1) for failure to state a claim

upon which relief may be granted.[1]

I

Oliver alleges the following sequence of events from which his claims arise.  On February

23, 2008, Oliver received a visit from Ms. Isabelle Wright in the visiting room at Green Rock.  After

they had been seated and talking for about an hour and a half, he saw a man walk past their table,

looking around as though he were searching for someone.  Sgt. Gibbs walked over to the man, later

identified as Nathaniel Hairston, and talked with him for a few minutes.  Then, Gibbs came to Oliver

---

[1] A complaint filed by an inmate challenging the conduct of an "officer or employee of a governmental entity" may be dismissed under §1915A(b)(1) if the complaint is "frivolous, malicious or fails to state a claim upon which relief may be granted."

1

and told him that Hairston had come to visit Oliver.

Oliver responded, "I don't know him." Gibbs said, "Well, he's here to see you." Oliver told Gibbs that he did not know Hairston and did not want to visit with him because he already had a visitor, Ms. Wright, an ordained minister. Gibbs returned in a few minutes with a chair and Hairston and seated Hairston at the table with Oliver and Ms. Wright.

Ms. Wright told Oliver that Hairston was the man who had been "stalking" her. She had taken out a protective order against him. She got up and ended the visit with Oliver, because she was afraid for her safety. Minutes later, Hairston got up and followed Ms. Wright out of the visiting room and into the reception building.

When Oliver called Ms. Wright later that night to see if she was alright, she told him that officers Coleman, Fountain, and Reeves had completed the necessary paperwork for Hairston to enter the prison. Where the form asked which inmate Hairston had come to visit, the answer was "whoever Isabelle Wright had come to see." Ms. Wright also told Oliver that as Hairston was leaving the reception area, guards searched him and found a knife. Since the incident, Ms. Wright refuses to visit Oliver, because she fears for her safety at Green Rock.

Oliver sues several Green Rock officers and the warden. He asserts that the defendants: failed to follow the policy of the Virginia Department of Corrections (VDOC) and deliberately indifferent to a risk of harm and negligent when they (1) did not ask Oliver if he wanted Hairston to visitor or obtain Oliver's written consent to the visit; (2) revealed Oliver's name as the person that Ms. Wright had come to see; (3) filled out paperwork to allow Hairston to gain entry to the prison; (4) failed to perform a "shakedown" for weapons on Hairston before allowing him into the visiting area; and (5) did not respect Oliver's statement that he did not want a visit with Hairston.

2

Oliver alleges that since the "stalker" incident, he has suffered depression, mental anguish, nausea, sleeplessness, weight loss of more than 13 pounds, night terrors, nervous "ticks" in his eye lids, and "shakes in [his] hands." Oliver filed requests, asking to see psychologist C. Schneider about getting mental health treatment. When he was finally scheduled to see Schneider, the psychologist informed Oliver that he could not prescribe medication or otherwise help him with what he was "going through." Nevertheless, Oliver asked to see Schneider a second time. At the second visit, Schneider allowed Sgt. Stoots, a security officer, to be present while he talked with Oliver, "knowing full well that the content of that meeting would be spread through the ranks of the officers . . . increasing the amount of 'sideward looks,' rumors, retribution, and 'suggestions' by staff" for Oliver to "drop" his grievances about the unwanted visitor. Shortly after the visit, Oliver lost his prison job for a "fabricated reason." The loss of income compounded Oliver's stress. When he met with Schneider a third time, the psychologist told him that he did not believe medication was warranted and that he could not offer Oliver any other suggestions about dealing with his mental health problems.

Oliver further alleges that Green Rock "staff" have retaliated against him for pursuing his complaints about the stalker incident. He alleges that officers have leaked a rumor that Oliver is a snitch and have made verbal taunts, such as comments that they don't want to talk to him because they don't want to get "wrote up." Officer "Ms. Grey" told Oliver that he might as well drop his grievance because "the film's gonna say that they came in together."[2] Officer Lynchard asked Oliver, as a favor to Lynchard to avoid "getting on his bad side," to omit Sgt. Gibbs from the

---

[2]Oliver stated in grievances that Ms. Wright filed an affidavit stating that she had not entered the prison with Hairston and that she had no knowledge that he was at the prison until Gibbs brought him over to the table where she was seated with Oliver.

3

grievance about the stalker incident. Oliver filed a grievance about Lynchard's behavior. Officers later met with Oliver and told him that "the problem with the visiting room ha[d] been 'taken care' of and that [he] needed to 'drop' his grievance[s]" about the stalker incident and the incident with Lynchard. Captain Myers stated that Lynchard's discussion with Oliver was appropriate under the policy allowing officers to try and resolve problems outside the grievance process. Oliver did not withdraw the grievances. Shortly after the meeting with Myers, Oliver requested a clothing exchange. The clothes he received had been washed, but were stained in the crotch and underarms. When he asked for new clothes, Mr. Giles told him that the stained clothes were "all they had," although Oliver had seen inmates before and after him in line receive "brand new boxers." Oliver believes he got stained clothes in response to his earlier confrontation with the grievance coordinator over the "loss" of grievances he had filed. When Oliver "demanded clean whites like everybody else," officers took him to the Watch Commander's office. Major Reddman told him, "The institution is not required to give out new whites to everybody because they were on a budget." Oliver had to wear the "dingy whites" for six months.

In April 2008, the Warden come through the kitchen on a "walk through" while Oliver was working there. After all the inmate kitchen workers had been "patted down," kitchen officers picked Oliver out of a group of inmates for a strip search, stating that it was a routine "shake down." In his pocket, they found and seized two packets of mayonnaise, a "balled-up plastic glove with . . . ham fat in the fingers," and a napkin.[3] Officers took this "evidence" into a private meeting with the Warden, and then told Oliver that the Warden had said to "get him [Oliver] out of here." Oliver later received a disciplinary charge. He believes the kitchen incident was retaliation for his refusal to drop

---

[3]Oliver claims that the fat was from a sandwich he had eaten.

4

his grievances about the stalker.

Oliver pursued his grievance about the stalker incident through all levels of the grievance procedure, and at Level II, it was deemed "founded." Nevertheless, Oliver appealed the Level II response to Level III because officials had not addressed his allegations of a "conspiracy" among Green Rock staff to "cover up" the incident. In response to this appeal, an ombudsman replied that Oliver's grievance did not "meet the criteria for a Level III response" because it did not "challeng[e] the substance or interpretation of" VDOC policy.

II

To state a cause of action under §1983, a plaintiff must establish that he, personally, has been deprived of rights guaranteed by the Constitution or laws of the United States and that this deprivation resulted from conduct committed by a person acting under color of state law. West v. Atkins, 487 U.S. 42 (1988). A prisoner proceeding pro se may only seek to enforce his own rights, not the rights of other inmates, family members, or friends. See Hummer v. Dalton, 657 F.2d 621, 625-626 (4th Cir.1981) (holding that pro se prisoner may not serve as a "knight errant" to vindicate anyone's rights but his own); Inmates v. Owens, 561 F.2d 260 (4th Cir. 1977) (to state civil rights claim, plaintiff must allege facts demonstrating that he himself has sustained, or will sustained, deprivation of right, privilege or immunity secured by the constitution or federal law). See also Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 166 (1972) (a litigant "has standing to seek redress for injuries done to him, but may not seek redress for injuries done to others").

Oliver cannot sue on behalf of Ms. Wright, based on the emotional distress and fear that she allegedly suffered as a result of being seated by prison officials at the same table with the man who had been stalking her. Ms. Wright may bring her own lawsuit against officials, but Oliver may only

5

sue to vindicate his own rights. Accordingly, to the extent that he seeks to recover monetary damages, based on the allegations that officers failed to protect Ms. Wright or that the stalker incident caused her mental distress, his complaint must be dismissed, pursuant to § 1915A.

Oliver also cannot recover monetary damages based on his allegation that the stalker incident deprived him of his right to enjoy visitation with Ms. Wright. It is well established that neither prisoners nor would-be visitors have any constitutional right to prison visitation. Mauldin v. Rice, 833 F.2d 1005, 1005 (4th Cir. 1987) (unpublished) (citing White v. Keller, 438 F. Supp. 110 (D. Md. 1977), aff'd, 588 F.2d 913 (4th Cir. 1978)). See also Overton v. Bazzetta, 539 U.S. 126, 131-32 (2003) (holding that restrictions on prisoner visitation rights did not violate Due Process or First Amendment). Moreover, an inmate may not sue for monetary damages for emotional distress resulting "suffered while in custody without a showing of physical injury." 42 U.S.C. § 1997e(e). Under these principles, the deprivation of visits with Ms. Wright does not present a constitutional claim, and the alleged depression and emotional distress Oliver suffered from not being able to visit with her does not give rise to a cause of action under § 1983. All such claims must be dismissed, pursuant to § 1915A.

Next, Oliver cannot pursue claims under § 1983 that officials violated prison regulations or performed their duties in a negligent manner. Violations of state law by state officials do not provide basis for constitutional claims under §1983. Weller v. Dep't of Social Services, 901 F.2d 387, 392 (4th Cir. 1990). Additionally, 42 U.S.C. § 1983 does not impose liability for violations of duties of care arising under state law. DeShaney v. Winnebago County Dept. of Social Servs., 489 U.S. 189, 200-03 (1989). Mere negligence by prison officials does not implicate the Due Process Clause. Daniels v. Williams, 474 U.S. 327 (1986). So Oliver's allegations that officials should have been

6

more careful in screening individuals for weapons before allowing them to enter visiting area, should not have revealed his name to Hairston, and should not have prepared paperwork for Hairston to enter the prison to visit Oliver without getting Oliver's consent to the visit—none of these allegations state claim that is actionable under § 1983.

Oliver also fails to state a claim that officers were deliberately indifferent to his safety in violation of the Eighth Amendment. See Farmer v. Brennan, 511 U.S. 825, 837 (1994); ( "[A] prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference"). Oliver does not allege facts offering any indication that officials knew that Hairston was stalking Ms. Wright or that he posed a serious risk of harm to Oliver. Accordingly, the court must dismiss all claims alleging that officials failed to protect Oliver from the attack by Hairston.

Oliver complains throughout that prison officials did not respond promptly to his informal inmate complaint forms or grievances or did not respond adequately to his requests in the grievance proceedings. Inmates do not have a constitutionally protected right to a grievance procedure. Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994); Flick v. Alba, 932 F.2d 728, 729 (8th Cir. 1991). Because a state grievance procedure does not confer any substantive right upon prison inmates, a prison official's failure to comply with the state's grievance procedure is not actionable under §1983. Mann v. Adams, 855 F.2d 639, 640 (9th Cir. 1988); Azeez v. De Robertis, 568 F. Supp. 8, 9-11 (N.D. Ill. 1982). Moreover, because state grievance procedures are separate and distinct from state and federal legal procedures, an institution's failure to comply with state grievance procedures does

7

not compromise its inmates' right of access to the courts. Flick v. Alba, 932 F.2d 728, 729 (8th Cir. 1991). In short, Oliver has no actionable claim under § 1983, based on officials' alleged failure to comply with the prison grievance procedures.

Finally, Oliver alleges that officers retaliated against him for filing grievances about the stalking incident. Claims of retaliation by inmates are generally treated with skepticism because "[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds to prisoner misconduct." Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir.1996); Adams, 40 F.3d at 74. To succeed on his retaliation claim, an inmate must allege facts sufficient to demonstrate that the alleged retaliatory act "was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." Id. at 75. Thereafter, plaintiff must demonstrate that he suffered some adverse impact or actual injury. ACLU of Md., Inc. v. Wicomico County, Md., 999 F.2d 780, 785 (4th Cir.1993). Additionally, an inmate must come forward with specific evidence "establish[ing] that but for the retaliatory motive, the complained of incident ... would not have occurred." Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir.1995). On the other hand, an inmate must present more than conclusory allegations of retaliation. Adams, 40 F.3d at 74.

Oliver does not allege facts supporting each element of a retaliation claim. First, the alleged motivation behind the retaliatory acts was his use of the grievance procedures. Since he has no constitutional right to have or to utilize a prison grievance procedure, his act of pursuing grievances about the stalker incident was not exercise of a constitutional right. Second, he alleges no connection between the supposed acts of retaliation (such as giving him stained clothing and causing him to lose his prison job) and exercise of any specific constitutional right. Conclusory assertions of a connection are not sufficient to give rise to a § 1983 claim of retaliation. Third, Oliver does not

8

allege that losing his job or wearing stained underwear chill's his exercise of any constitutional right. As the court is satisfied that Oliver can prove no set of facts consistent with his allegations that would state any claim actionable under § 1983, the court will dismiss the entire complaint, pursuant to § 1915A(b)(1). An appropriate order shall be entered this day.

The plaintiff is advised that he may appeal this decision pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure by filing a notice of appeal with this court within 30 days of the date of entry of this opinion and the accompanying order, or within such extended period as the court may grant pursuant to Rule 4(a)(5).

The Clerk is directed to send copies of this memorandum opinion and accompanying order to plaintiff.

ENTER: This _12th_ day of December, 2008.

_James C. Turk_
Senior United States District Judge

9